Filed 6/23/15  P. v. Gomez CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B251303 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. PA070040) |
| v. | |
| JOVANI GOMEZ et al., | |
| Defendants and Appellants. | |

APPEALS from judgments from the Superior Court of Los Angeles County, Hayden Zacky, Judge.  Affirmed in part, reversed in part and remanded with directions.

Susan K. Shaler, under appointment by the Court of Appeal, for Defendant and Appellant, Jovani Gomez.

Joanna McKim, under appointment by the Court of Appeal, for Defendant and Appellant, Kevin Alvarenga.

David H. Goodwin, under appointment by the Court of Appeal, for Defendant and Appellant, Juan Carlos Andrade.

Janyce Keiko Imata Blair, under appointment by the Court of Appeal, for Defendant and Appellant, Leonardo Garcia.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle and John Yang, Deputy Attorneys General, for Plaintiff and Respondent.

Jovani Gomez, Kevin Alvarenga, Juan Carlos Andrade and Leonardo Garcia were tried together and convicted by the same jury of first degree murder, attempted premeditated murder, two counts of shooting at an inhabited dwelling, discharging a firearm with gross negligence and street terrorism.  The jury also found true specially alleged criminal street gang and firearm-use enhancements.  In addition, Gomez and Garcia were convicted of possession of a firearm by a felon; and in a bifurcated sentencing hearing both men admitted the truth of specially alleged enhancements for serving prior prison terms for felonies.

On appeal Gomez, Alvarenga, Andrade and Garcia contend their convictions for first degree premeditated murder must be reversed because those convictions could have been based on the natural and probable consequences theory of aiding and abetting rather than direct aiding and abetting, contrary to the Supreme Court's recent decision in *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*).  They also challenge several of the trial court's evidentiary rulings and jury instructions, certain of the prosecutor's statements during the trial and the propriety of aspects of their sentences—162 years to life for Gomez and 160 years to life for Garcia, Alvarenga and Andrade.  Garcia also challenges the sufficiency of the evidence supporting the jury's finding he personally and intentionally discharged a firearm causing great bodily injury or death.[1]  Finally, Alvarenga, who was 17 years old at the time of the offenses, contends his sentence was imposed in violation of *Miller v. Alabama* (2012) 567 U.S. __ [132 S.Ct. 2455, 183 L.Ed.2d 407] (*Miller*).

We reverse the defendants' convictions for first degree murder (count 1) and discharge of a firearm with gross negligence (count 7), vacate the defendants' sentences in their entirety and remand for resentencing.  On remand the People will have the election in accordance with *Chiu* of accepting a reduction of the murder convictions on count 1 to second degree murder, with all associated enhancements found true by the jury, or to retry the greater offense of first degree premeditated murder (along with the

---

[1]     As authorized by California Rules of Court, rule 8.200(a)(5), Gomez, Alvarenga, Andrade and Garcia join in each other's arguments to the extent they are applicable.

accompanying specially alleged enhancements) under a direct aiding and abetting theory. In all other respects (as to counts 2-6 and 8), we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *The Information*

Gomez, Alvarenga, Andrade and Garcia were charged in an information with murder (Pen. Code, § 187, subd. (a))[2] (count 1), attempted premeditated murder (§§ 187, subd. (a), 664) (count 2), two counts of shooting at an inhabited dwelling (§ 246) (counts 3 and 4), discharge of a firearm with gross negligence (§ 246.3, subd. (a)) (count 7) and street terrorism (§ 186.22, subd. (a)) (count 8). Gomez and Garcia were also charged with one count each of being a felon in possession of a firearm (former § 12021, subd. (a)(1))[3] (counts 5 and 6). It was specially alleged as to counts 1 through 7 that the offenses had been committed for the benefit of a criminal street gang (§ 186.22, subd. (b)).[4] It was specially alleged as to counts 1 through 4 that each of the defendants had personally used and intentionally discharged a firearm causing great bodily injury or death (§ 12022.53, subds. (b), (c), (d)) and/or a principal personally used and intentionally discharged a firearm causing great bodily injury or death (§ 12022.53, subd. (e)(1)). In addition, it was specially alleged that Gomez had served two prior prison terms for felonies and Garcia had served one prior prison term for a felony within the meaning of section 667.5, subdivision (b). Gomez, Alvarenga, Andrade and Garcia each pleaded not guilty and denied the special allegations.

---

[2]     Statutory references are to this code unless otherwise indicated.

[3]     Former section 12021, subdivision (a)(1), in effect at the time the offenses were committed, was repealed effective January 1, 2011 and recodified without substantive change in section 29800, subdivision (a)(1).

[4]     For simplicity this opinion occasionally uses the shorthand phrase "to benefit a criminal street gang" to refer to crimes that, in the statutory language, are committed "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members. . . ." (§ 186.22, subd. (b); see *People v. Jones* (2009) 47 Cal.4th 566, 571, fn. 2.)

2. *The Trial*

According to the evidence at trial, German Chairez and Leonel Serrano were members of Columbus Street, a criminal street gang. Gomez, Alvarenga, Andrade and Garcia are members of the Vincent Town criminal street gang, a rival of Columbus Street's. On November 19, 2010 Chairez and Serrano were visiting a friend at an apartment complex located at 15115 Parthenia Street in the North Hills section of the San Fernando Valley. As they walked down the stairs from apartment number 279 on their way out of the complex, Serrano heard someone shout "Fuck Columbus!" and saw two men shooting at him and Chairez. Serrano and Chairez immediately turned around and raced back up the stairs to the apartment as shots continued to be fired. Both men were hit in the back. Chairez died from a bullet that perforated his lung. Serrano survived. He was hospitalized overnight but did not require surgery. Serrano testified, consistently with what he told police, he did not clearly see, and could not identify, the shooters.

Salvador Ortiz was in the area of the apartment complex on the night of the shooting and encountered Andrade, Garcia and Gomez, known to him by their gang monikers, "Happy," "Baby"[5] and "Clever," respectively. Ortiz noticed Andrade and Garcia were armed. One man had a semiautomatic weapon; the other a revolver. Their conversation was friendly because Ortiz, a member of the Barrio Van Nuys gang, was not a rival. Within a few minutes of talking to them, Ortiz heard a person in the alley shout that a "Columbus Streeter" was nearby. Andrade, Garcia and Gomez took off running toward the apartment complex. Ortiz saw Garcia quickly pull out a gun from underneath his sweatshirt. Almost immediately, Ortiz heard a barrage of gunshots fired from two different guns. He believed at least two different types of guns were fired because they sounded different from one another; one was faster, the other was slower and had more of a bass tone and an echo sound. He did not see the actual shooting.

---

[5] There was undisputed evidence that Garcia was known by the gang monikers Big Boy and Baby.

4

Maria Gutierrez, Chairez's girlfriend and the mother of his child, testified after Serrano had denied seeing the shooters. Gutierrez explained she had overheard Serrano tell his friend that Clever and Big Boy, referring to Gomez and Garcia, had been the shooters and Happy and Kevin, referring to Andrade and Alvarenga, "had [also] been there" in the car. Detective Gretchen Schultz, called by the defense, testified that, when Gutierrez had first told her about Serrano's conversation, she said he had identified Gomez, Garcia and Alvarenga. She did not mention Andrade.

Brandon Binning testified that two days before the shooting Andrade had told him something "was going to go down" and "Columbus Street was going to see that Vincent Town was back."

Los Angeles Police Detective Gene Parshall investigated the shooting. He found bullet fragments, bullet holes and fresh blood stains inside apartment number 279 in building C where Chairez and Serrano had retreated to escape the gunfire (for trial purposes the three buildings in the apartment complex, which were connected by a common hallway, were designated buildings A, B and C); additional bullet fragments in the walls and door of apartment number 131 in building A; several spent casings in the hallway leading from building A and along the common hallway between buildings B and C and in the planter of building C. Both apartment numbers 131 and 279 were inhabited dwellings. Parshall opined, based on the evidence, including the spent casings and location of the bullet fragments and bullet holes, the suspects had begun shooting in building A, chased the victims through the hallway past building B to building C and then all the way to apartment number 279.

Los Angeles Police Department criminalist Fadil Biraimah testified, based on ballistics testing, that the spent casings found at the scene had come from the same type of semiautomatic gun, a Glock Sauer, but he could not say with certainty they were all shot from the same weapon. The murder weapon was never found.

Los Angeles Police Officer Larry Hernandez testified that Columbus Street and Vincent Town were rival gangs. The primary activities of the Vincent Town gang were illicit drug sales and violence that accompanied those sales. Responding to a hypothetical

reflecting the facts of the case, Hernandez opined the shooting benefitted the Vincent Town gang because such a crime asserts the gang's power over the territory and intimidates local residents, making them afraid to report the gang's drug activity.

After their arrests Gomez, Andrade, Alvarenga and Garcia were placed in custody and their jail cell conversations recorded by law enforcement. Among other things, the men discussed how Serrano would not "snitch," and the police would not be able to track them by cell phones because "we made no motherfuckin' calls." Gomez's telephone calls from jail were also recorded. During one call Gomez told an unidentified man, "We got alibis . . . . We were at a club that day, know me?" The man asked, "Were all four together when it happened?" Gomez replied, "Uh, yeah, yeah, yeah, we were." The man said, "Just to mak[e] sure that everybody, everybody that's saying they're gonna say that you were with them, and that they actually say it." On another recorded call Gomez's sister, Karely Gomez, told him that Alvarenga had been asking "should I say like, I was in the club too, you know?" Gomez told her to "shut up, man. . . . Umm, I'll tell you when you come to visit." The recordings were played for the jury. The prosecutor argued the recorded telephone calls evidenced an attempt to fabricate an alibi.

Wally Urquilla testified that Alvarenga had told him he shot Chairez. Ernie Urquilla, Wally's brother, told police Alvarenga and Chairez had feuded in the past and Chairez had once shot at Alvarenga. Ernie Urquilla later recanted, told police he did not want to testify, and at trial denied Alvarenga had ever told him about the shooting. After a recording of his police interview was played for the jury, Ernie Urquilla claimed the police had frightened him and he had told them "what they wanted to hear." Cesar Roman also told police he had overheard Alvarenga alternately brag that he had shot Chairez and that he had been the driver when Chairez was shot. At trial on cross-examination Ramon said he said he had heard this rumor on the street and, despite what he had told police, had not been present when those remarks were made.

The defense theory was that the police had arrested the wrong people. Andrade, Alvarenga and Gomez did not testify. Garcia testified in his own defense, claiming he had been at home in North Hollywood at the time of the shooting, more than

6

20 to 25 minutes away from the crime scene. He sent a text message to his girlfriend at 11:12 p.m., the approximate time of the shooting, that he was going to sleep. Cell records show his cell phone was in the vicinity of his home at the time of the shooting. Despite his message to his girlfriend, he did not go to sleep. Instead, he went to a nightclub with Andrade, arriving sometime between 11:00 p.m. and 12:00 a.m. He saw Gomez there, too.

The People introduced evidence that Gomez had made a call from his cell phone to Andrade at 11:16 p.m., the approximate time of the shooting. The call, which went to Andrade's voicemail, connected to a Sprint Telecommunications Network (Sprint) cell tower just south of the crime scene. The People's wireless expert testified Gomez's cell phone was "in the vicinity" of the crime scene at the time of the shooting. However, a wireless expert for the defense testified that the dominant Sprint cell tower covering the crime scene was north of the shooting location; and Gomez's call had connected to a cell tower south of it.

Martin Flores, a director of a center providing services to at-risk youth, including gang members, testified as a defense expert on gang culture. He stated young people join gangs because the gang gives them the sense of belonging and connection they lack at home. Although it is widely believed that gangs "punish snitches," in reality gangs rarely seek retribution. Only a small percentage of gang members, he stated, commit violent crimes.

### 3. *Jury Instructions, Verdict and Sentence*

The People's theory at trial was that each of the defendants was either a direct perpetrator of the crimes charged or aided and abetted those offenses. In addition to instructions on murder (CALCRIM No. 520), first degree premeditated murder (CALCRIM No. 521), attempted murder (CALCRIM No. 600), attempted premeditated murder (CALCRIM No. 601) and shooting at an inhabited dwelling (CALCRIM No. 965), among others, the jury was also instructed on direct aiding and abetting principles (CALCRIM Nos. 400, 401), and the natural and probable consequences doctrine as a form of aiding and abetting (CALCRIM Nos. 402, 403). Under the natural

7

and probable consequences doctrine, the jury was told, it could find any one of the defendants guilty of murder and/or attempted murder if he aided and abetted the target offenses of shooting at an inhabited dwelling and/or the uncharged target offense of assault with a firearm, and the natural and probable consequence of either target offense was murder or attempted murder.

The jury convicted Gomez, Andrade, Alvarenga and Garcia of first degree premeditated murder and all other charged offenses and found each of the special allegations true. In a bifurcated proceeding Gomez and Garcia admitted the truth of the special allegations that they had served prison terms for felonies within the meaning of section 667.5, subdivision (b). Gomez was sentenced to an aggregate indeterminate term of 162 years to life; Andrade, Alvarenga and Garcia[6] to aggregate indeterminate terms of 160 years to life.

## DISCUSSION

1. *The Trial Court's Instruction Permitting Gomez, Alvarenga, Andrade and Garcia To Be Convicted of First Degree Premeditated Murder Under the Natural and Probable Consequences Doctrine Was Prejudicial Error*

In *Chiu,* decided after the trial in this case, the Supreme Court held aiders and abettors may be convicted of first degree premeditated murder under direct aiding and abetting principles, but not under the natural and probable consequences doctrine. (*Chiu, supra,* 59 Cal.4th at pp. 158-159.)[7] The Court explained that the natural and probable

---

[6]     The special allegation that Garcia had served a prior prison term for a felony within the meaning of section 667.5, subdivision (b), was dismissed in furtherance of justice. (§ 1385.)

[7]     As the Court explained in *Chiu,* there are two distinct forms of aider and abettor culpability. First, an aider and abettor with the requisite mental state is guilty of the intended crime. Second, under the natural and probable consequences doctrine, an aider and abettor is guilty of both the intended target crime and any other offense that was a natural and probable consequence of the intended crime. "'Thus, for example, if a person aids and abets only an intended assault, but a murder results, that person may be guilty of that murder, even if unintended, if it is a natural and probable consequence of the intended assault.'" (*Chiu, supra,* 59 Cal.4th at p. 161.) "Because the nontarget offense is unintended, the mens rea of the aider and abettor with respect to that offense is irrelevant

8

consequences doctrine in the murder context serves a legitimate public policy concern of deterring persons from aiding or encouraging the commission of offenses that would naturally, probably and foreseeably result in an unlawful killing. While that policy is furthered by holding the defendant culpable for second degree murder, the Court explained, "the policy is not served in the context of first degree murder, which requires a mental state of premeditation and deliberation that is, by definition, uniquely subjective and personal." (*Id.* at p. 166; see *ibid.* ["[t]he connection between the defendant's culpability and the perpetrator's premeditative state is too attenuated to impose aider and abettor liability for first degree murder under the natural and probable consequences doctrine, especially in light of the severe penalty involved and the above-stated public policy concern of deterrence"].) Direct aiding and abetting principles, the Court announced, do not present the same problem. "[A]n aider and abettor who knowingly and intentionally assists a confederate to kill someone could be found to have acted willfully, deliberately, and with premeditation, having formed his own culpable intent. Such an aider and abettor, then, acts with the means rea required for first degree murder. (*Id.* at pp. 166-167.)

*Chiu* involved a teenage defendant who had instigated a fight that resulted in another individual shooting the victim. The jury was instructed it could convict the defendant of murder if it found he either directly aided and abetted the murder or aided and abetted the target offense of assault, the natural and probable consequence of which was murder. (*Chiu, supra,* 59 Cal.4th at p. 160.) Because the record indicated the jury may have relied on the natural and probable consequences doctrine in convicting the defendant of first degree premeditated murder, the Court reversed, explaining it could not conclude beyond a reasonable doubt that the jury had relied on a legally valid theory. (*Id.* at p. 168.)

---

and culpability is imposed simply because a reasonable person could have foreseen the commission of the nontarget crime." (*Id.* at p. 164.)

The Attorney General argues this case is distinguishable from *Chiu* in one material respect: In *Chiu* the jury was told that "to find defendant guilty of first degree murder, the People had to prove that the perpetrator acted willfully, deliberately, and with premeditation" (*Chiu, supra,* 59 Cal.4th at p. 161, citing CALCRIM No. 521), while here the jury was instructed (also in accordance with CALRIM No. 521) that first degree premeditated murder required a finding "the defendant" acted willfully, deliberately and with premeditation. This distinction between perpetrator and defendant is critical, the Attorney General argues, because the jury in the instant case was properly advised that it could find the defendant guilty of first degree premeditated murder only if "he" possessed the requisite mental state of premeditation and deliberation. According to the Attorney General, this instruction ensured any finding of first degree premeditated murder was based on each defendant's own mental state of premeditation and deliberation and not on another theory of culpability.

Contrary to the Attorney General's contention, the difference between the instruction in this case and that given in *Chiu,* if any,[8] did not negate the error identified in *Chiu*. This case involved four defendants. The jury could have reasonably understood the term defendant in CALCRIM No. 521 to refer to the defendant shooter, particularly in light of other instructions permitting a finding of culpability under the natural and probable consequences doctrine. At the very least, without a clarification that the natural and probable consequences doctrine was limited to second degree murder, the instructions as a whole effectively permitted the jury to convict some or all of the defendants of first degree premeditated murder as an aider or abettor under that legally invalid theory. This was error. (See *Chiu, supra,* 59 Cal.4th at p. 167; see also *Francis v. Franklin* (1985) 471 U.S. 307, 322 [105 S.Ct. 1965, 85 L.Ed.2d 344] ["Language that

_____

[8]     The Supreme Court did not quote the instruction given in *Chiu*; it paraphrased the instruction, citing to CALCRIM No. 521, the same instruction given here. While there were reasons in *Chiu* to refer to the perpetrator rather than the defendant, we are not confident that the instruction was actually different, nor, for the reasons we explain, was the cited distinction material.

10

merely contradicts and does not explain a constitutionally infirm instruction will not suffice to absolve the infirmity. A reviewing court has no way of knowing which of the two irreconcilable instructions the jury applied in reaching their verdict."].)

The Attorney General's contention the error was harmless given "the overwhelming evidence of planning and premeditation" is also without merit. "When a trial court instructs a jury on two theories of guilt, one of which was legally correct and one legally incorrect, reversal is required unless there is a basis in the record to find that the verdict was based on a valid ground." (*Chiu, supra,* 59 Cal.4th at p. 67; see *People v. Chun* (2009) 45 Cal.4th 1172, 1204 [reversal for instructional error is not proper "'if the jury verdict on other points effectively embraces this one or if it is impossible, upon the evidence, to have found what the verdict *did* find without finding this point as well'"].) Although the evidence is certainly sufficient to support a finding of premeditation and deliberation in this case, the prosecutor relied heavily on the natural and probable consequences doctrine at trial, telling the jury repeatedly during closing argument it need not find the defendants intended to commit a murder so long as it found murder was a natural, probable and foreseeable consequence of a different target offense.[9] Nothing in this record demonstrates beyond a reasonable doubt that the jury based its verdict on the legally valid direct aiding and abetting (or direct perpetrator) theory rather than the invalid natural and probable consequences doctrine. (See *Chiu,* at pp. 167-168; *Neder v. United States* (1999) 527 U.S. 1, 15 [119 S.Ct. 1827, 144 L.Ed.2d 35]; *People v. Gonzalez* (2012) 54 Cal.4th 643, 663.).[10]

_____

[9] The prosecutor stated, "Remember [what] I told you regarding aiding and abetting[,] that it's derivative liability? You don't necessarily have to know and share the intent of the perpetrator. Although I submit to you, ladies and gentlemen, all four of them intended to kill in this case. That's what the facts show you. But even if they didn't. Let's say for some reason you believe that Kevin Alvarenga just wanted to scare. Because the reasonable and the natural and probable consequence of scaring with guns in rival territory is a murder could happen, then he would be guilty of the resulting murder."

[10] Garcia also contends his conviction for first degree murder must be reversed because the instructions to the jury on direct aiding and abetting (CALCRIM Nos. 400,

11

As the *Chiu* court explained, the appropriate remedy for this instructional error is to reverse the first degree murder conviction and allow the People either to accept a reduction of the conviction to second degree murder or to retry the greater offense under a direct aiding and abetting theory. (*Chiu, supra,* 59 Cal.4th at p. 168.) Because this remedy is only appropriate if there are no other errors requiring reversal, we must address each of the defendants' other contentions.[11]

## 2. *The Trial Court's Evidentiary Rulings Do Not Compel Reversal*

### a. *The trial court did not commit prejudicial error in limiting the testimony of the defense expert on cell technology*

Jim Cook, an expert on wireless technology, testified for the People using detailed call records from each of the defendants' cell phones. Based on a map he had created showing the cell tower the call connected to and the approximate range of coverage of that tower, Cook testified that Gomez's phone had been in the vicinity of the crime scene at the time of the call. Cook explained he could not identify the precise location of the phone because that required use of global positioning technology in real time, that is, at the time of the event. Here, he had to rely on historical data, which could only yield an

---

401) did not make clear that, for first degree murder, the aider and abettor must also share the perpetrator's mens rea of premeditation and deliberation. (But see CALCRIM No. 401 ["[s]omeone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime"]; *Chiu, supra*, 59 Cal.4th at pp. 167-168.) Alvarenga contends the court's response to a jury question improperly permitted the jury to convict the defendants of first degree premeditated murder under the natural and probable consequences doctrine. In light of our holding reversing the defendants' first degree murder convictions, both of these contentions are moot.

[11]     As the defendants implicitly acknowledge by not challenging their convictions on count 2 for attempted premeditated murder, those convictions are not subject to reversal on this ground. (See *Chiu, supra,* 59 Cal.4th at p. 162; *People v. Favor* (2012) 54 Cal.4th 868, 879-880 [under the natural and probable consequences doctrine as applied to the premeditation allegation under section 664, subdivision (a), a trial court need only instruct that the jury find that attempted murder, not attempted premeditated murder, was a foreseeable consequence of the target offense].)

12

approximate location of the phone. On cross-examination Cook acknowledged he could not determine from the historical data which of several Sprint towers closest to the crime scene was the most likely to connect a call made from the crime scene. He also conceded he could not identify from these data whether the cell phone was actually in the possession of Gomez. Finally, he reiterated he could only give an approximate location of Gomez's handset at the time the 11:16 p.m. call was made because the range of a cell site's sector's coverage is based on a variety of factors, including the existence of adjacent cell towers in a given area.

Josef Napuli, an electronic communication engineer employed by Erricson, a communications technology company and a Sprint contractor, was called as a defense expert to address and rebut Cook's testimony. Napuli testified over the course of three days. There were multiple interruptions in his testimony for Evidence Code section 402 hearings after Napuli gave unclear or nonresponsive answers. During one of those preliminary fact hearings, the court inquired whether Napuli had created the maps he was relying on in forming his opinion about the range of coverage of the cell tower that had connected Gomez's call. Napuli responded he had not created the coverage maps himself; they were prepared in India by employees of Ericcson at his request. He added he regularly relied and used similar maps in the course of his employment to determine coverage issues. Following the hearing, the court ruled Napuli could not rely on maps he had not prepared himself, finding the coverage maps he referred to did not have sufficient indicia of reliability because Napuli could not be certain the information he had given to data processors in India had been input correctly.[12]

After Napuli's examination resumed in front of the jury, Napuli agreed with Cook that Gomez's call had connected to ("pinged") a Sprint cell tower south of the crime

---

[12] The court stated, "The analogy that I'm starting to draw here is . . . let's say this witness is a coroner. And let's say that, you know he has given an opinion regarding the cause of death by looking at some documents. But if the person who did the autopsy and created the coroner report wasn't a physician, and was just some layman, then the information that the witness is relying on is faulty. And I see that kind of being analogous to what was being elicited so far."

13

scene. Asked about the range of coverage of the cell tower that Gomez's phone pinged—and in particular, whether the tower had sufficient signal strength to connect to a call initiated from the crime scene—Napuli attempted to answer the question by referring to Sprint's coverage maps, which Napuli testified he had used regularly in his employment to determine coverage of Sprint cell towers. The court sustained the prosecutor's objections and precluded Napuli from answering questions relating to the potential coverage of the cell tower to the extent he lacked personal knowledge or needed to rely on maps he did not personally create. However, despite this ruling, after more testimony and much colloquy between defense counsel and the court, the court ultimately permitted Napuli to testify there was a dominant cell tower that covered Sprint calls made from the crime scene; that dominant tower covering the crime scene was north of the crime scene; and, at 11:16 p.m., Gomez's phone had connected to a different tower south of the crime scene.

Gomez contends the court erred in limiting Napuli's testimony. He asserts "Napuli would have testified that 'during the 45-minute period encompassing the time of the murder,' Gomez's cell phone used a tower 'well south of the murder scene,' and the dominant tower that 'serviced the murder scene was . . . north of the site . . . Gomez's phone used . . . .'" Yet Gomez testified to exactly that at trial. He stated the dominant tower for the crime scene was north of the crime scene and Gomez's call had pinged a tower south of the crime scene. Even if the court's ruling prohibiting Napuli from relying on maps he regularly used in his field to determine cell tower coverage was unduly restrictive (see Evid. Code, § 801, subd. (b) [expert may rely on hearsay in forming an opinion as long as the material is reasonably relied upon by experts in the field; *People v. Montiel* (1993) 5 Cal.4th 877, 918-919 ["[a]n expert may generally base his opinion on any 'matter' known to him, including hearsay not otherwise admissible, which may 'reasonably . . . be relied upon' for that purpose"]), any abuse of discretion was plainly harmless as it is not reasonably probable he would have received a more favorable verdict absent the alleged error. (See *People v. DeHoyos* (2013) 57 Cal.4th 79, 120 [court's

14

evidentiary rulings subject to harmless error review under *People v. Watson* (1956) 46 Cal.2d 818, 836.)[13]

>   b. *The trial court's ruling limiting evidence of Gutierrez's prior statements does not compel reversal*

Guttierez testified she had overheard Serrano telling friends Gomez and Garcia were the shooters and Alvarenga and Andrade had also been present at the crime scene. To impeach Gutierrez's credibility and reinforce Serrano's earlier testimony that he did not see, and could not identify, the shooters, the defense sought to introduce a photograph of Gomez on which Gutierrez had written that her friend "Eric told me [Gomez] was the one who killed German [Chairez]." The photograph had been shown to Gutierrez as a part of a photographic lineup ("six-pack"). The prosecutor objected on the ground Eric's statements to Gutierrez were hearsay and not subject to a hearsay exception. (Serrano's statement to Gutierrez, in contrast, was admissible as a prior inconsistent statement because Serrano testified at trial he could not identify the shooters.) In addition, the prosecutor argued, the evidence was misleading. Although the defense sought to make it appear Gutierrez had made a prior inconsistent statement—telling police she had learned the information from Eric even though she testified she had learned it from Serrano—in fact, the full recording of her police interview revealed she told police that both Serrano and her friend Eric had identified Gomez. While Gomez and Andrade did not object to the entire tape being played for the jury, Alvarenga and Garcia did; they only wanted to impeach Guttierez and reinforce Serrano's testimony that he did not see, and could not identify, the shooter. The court ruled that, without a stipulation by all counsel to permit playing the full tape, it would exclude the recording and any identification of Eric specifically as the source of the information identifying Gomez, but would permit counsel to question Gutierrez as to whether she had obtained her information from

---

[13]   Even Gomez's trial counsel acknowledged that Napuli ultimately provided the opinion sought at trial. In his motion for mistrial after Napuli testified, Gomez's trial counsel acknowledged, "After many sustained objections, the court allowed the Defense to elicit an opinion that the sectors pinged by the alleged handset of Mr. Gomez could not service the murder scene and that there was another cell site which did."

Serrano and/or from another person. After reviewing a transcript of her police interview to refresh her recollection, Gutierrez testified on cross-examination she told police she had obtained her information about Gomez from Serrano and from someone else.

Gomez contends the court erred in excluding evidence of Gutierrez's writing on Gomez's photograph as well as her recorded police interview. Both were admissible, he argues, under Evidence Code sections 1235 (prior inconsistent statement) or 1236 (prior consistent statement), since Gutierrez was available to testify and could be asked about the statements she had made about Eric. (See Evid. Code, §§ 770, 791.) While we agree evidence of Gutierrez's writing and her statements to police were admissible, and portions of the recording could have been played without misleading the jury (Evid. Code, § 356), any error was plainly harmless. Both the recording and the writing on the six-pack, had they been admitted, would have demonstrated that Gutierrez had heard from both Serrano and from another person that Gomez was the shooter. That information was ultimately elicited, even if "Eric" as the source of the other person information was not. Nothing in this record suggests Gomez would have achieved a more favorable result had the writing or the recording of Guittierez's interview been admitted into evidence.

> c. *The trial court did not err in admitting evidence Alvarenga went to Gutierrez's residence with a gun after the shooting*

During trial Gutierrez testified, over Alvarenga's objections, that three or four weeks after the shooting, Alvarenga and his girlfriend appeared at Gutierrez's gated building, warned the person standing outside the gate that he had a gun and demanded to be let into the building. Gutierrez was on the stairs of her apartment, heard the conversation and saw the gun, but could not describe it at trial. Unsuccessful in their efforts to enter the building, Alvarenga and his girlfriend left.

Alvarenga argues, as he did at trial, the evidence was irrelevant because there was no showing the gun he displayed to Gutierrez had any connection to the crime; therefore, he contends, it amounted to improper character evidence in violation of Evidence Code section 1101 and, in any event, was far more prejudicial than probative. In overruling

16

Alvarenga's objections, the trial court explained the murder weapon had not been found and there was evidence more than one gun had been used. Under those circumstances, the court reasoned, the evidence was relevant to show more than simply Alvarenga's propensity to carry weapons; it had a tendency to show the gun he was carrying was one of those used in the crime. (See *People v. Cox* (2003) 30 Cal.4th 916, 954 ["'When the specific type of weapon used to commit a homicide is not known, it may be permissible to admit into evidence weapons found in the defendant's possession some time after the crime that could have been the weapons employed. There need be no conclusive demonstration that the weapon in defendant's possession was the murder weapon. [Citations.] When the prosecution relies, however, on a specific type of weapon, it is error to admit evidence that other weapons were found in his possession, for such evidence tends to show, not that he committed the crime, but only that he is the sort of person who carries deadly weapons.'"], disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390.)

As an alternative explanation, and the one we find more convincing, the court also observed that Alvarenga's appearance at Gutierrez's home armed with a gun a short time after the shooting was persuasive evidence that Gutierrez, who at times offered reluctant and disjointed testimony, was afraid of testifying against Alvarenga. (See, e.g. *People v. Burgener* (2003) 29 Cal.4th 833, 869 [evidence of a witness's fear of retaliation for testifying is relevant]; *People v Olguin* (1994) 31 Cal.App.4th 1355, 1367-1369 [same].) Significantly, the trial court admonished the jury not to consider the evidence for propensity, instructing the jury the evidence was admissible against Alvarenga for the limited and sole purpose of showing consciousness of guilt and against all defendants for the purpose of evaluating Gutierrez's credibility.[14] The court's limited admission of this evidence was entirely proper and well within its broad discretion.

---

[14] The court also instructed the jury, "During the trial, certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other."

d. *The trial court adequately instructed the jury to rely on the English translation of a recording over any other understanding*

During trial recordings of defendants' conversations with each other in their jail cells and with third parties on telephone calls made from jail were played for the jury. Some of those conversations contained Spanish words or phrases. A certified Spanish language interpreter testified she had listened to and transcribed the recordings. When Spanish was used, she transcribed the conversation directly on the left margin of the transcript using the Spanish and translated the Spanish terms into English in the right margin. The jury was advised repeatedly during trial that the recordings were the evidence, and "the transcripts are merely an aid to help you understand the recording."

Andrade contends the court's admonition that the tape, not the transcript, was evidence and the transcript was merely an "aid," although generally appropriate in trials not involving foreign language recordings, improperly allowed Spanish speaking jurors to hear different evidence from non-Spanish speaking jurors, a result that he maintains deprived him of a fair trial. The contention is without merit. The jury was instructed with CALCRIM No. 121,[15] which advised, "Some testimony may be given in Spanish. An interpreter will provide a translation for you at the time that the testimony is given. You must rely on that translation provided by the interpreter, even if you understand the language spoken by the witness. Do not retranslate any testimony for other jurors. If you believe the court interpreter translated testimony incorrectly, let me know immediately by writing a note and giving it to the bailiff." This instruction adequately informed the jury of its obligation to accept the English translation over any other understanding. Moreover, there is no indication in this record that any juror understood Spanish nor has Andrade identified any apparent discrepancy between the transcripts and the contents of the audio recordings. Thus, while it may have been good practice for the court to instruct

_____

[15] Although Andrade contends the instruction was only read during the preliminary instruction before trial, the record reflects it was also provided after the close of evidence as part of the written instructions given to the jury before deliberations.

18

the jury with alternative B of CALCRIM No. 121,[16] any error in failing to make clear to the jury that it was to consider the English translation provided in the transcript over the Spanish-speaking portions of the recording was not prejudicial under any standard. (See *Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 17 L.Ed.2d 705 [applying beyond-a-reasonable-doubt standard of review to errors of constitutional magnitude]; *People v. Breverman* (1998) 19 Cal.4th 142, 165 [instructional errors are reviewed under the standard articulated in *People v. Watson, supra*, 46 Cal.2d at p. 836].)

      3. *Substantial Evidence Supports the Jury's Finding Garcia Personally Used and Intentionally Discharged a Firearm Causing Great Bodily Injury or Death*

Garcia contends there is insufficient evidence to support the jury's findings under section 12022.53, subdivisions (c) and (d), that he personally and intentionally discharged a firearm. Relying on *People v. Pearson* (2012) 53 Cal.4th 306, he argues the evidence established that all the bullets came from a single firearm, the Glock semiautomatic, and there was no evidence he was the actual shooter. In *Pearson* the Supreme Court found the evidence insufficient to support a finding the defendant had personally used a deadly or dangerous weapon—a stake or stick—in the commission of a rape, kidnap and murder.

---

[16]     Andrade does not cite CALCRIM No. 121, alternative B, which specifically pertains to foreign language recordings. It provides, "You (may/are about to) hear a recording [that is partially] in a foreign language. You will receive a transcript with an English language translation of that recording. [¶] You must rely on the transcript, even if you understand the language in the recording. Do not share your own translation with other jurors. Please write a note to the clerk or bailiff if you believe the translation is wrong. [If the recording is partially in English, the English parts of the recording are the evidence.]" Andrade's counsel did not request the instruction; and no court has recognized a sua sponte duty to give it. (See Bench Notes, CALCRIM No. 121 ["The committee recommends giving Alternative A of this instruction whenever testimony will be received with the assistance of an interpreter, though no case has held that the court has a sua sponte duty to give the instruction. The instruction may be given at the beginning of the case, when the person requiring translation testifies, or both, at the court's discretion. If the jury may hear a recording that is at least partially in a foreign language, the court may give Alternative B with the appropriate bracketed language, as needed."].) In any event, as explained, in light of the instructions given and the absence of any evidence of a conflict between the recording and the transcript, any possible error was harmless.

19

The defendant admitted to police he, in concert with others, wrestled the victim to the ground, moved her to the place where the assault occurred, raped her, kicked her and moved her body after the attack, but said two other men had used the stake or stick to beat and sexually penetrate the victim. There was no physical evidence or eyewitness testimony that tied the defendant to the weapon, which was never recovered. Even viewing the evidence in the light most favorable to the judgment, the Court held, the evidence was insufficient to support a finding the defendant had personally used the stick in the attack (*Id.* at p. 319 ["[t]he evidence leaves it entirely *possible* defendant used the stake in attacking Sigler, but does not support a finding of such use beyond a reasonable doubt"].)

This case bears little similarity to *Pearson.* Contrary to Garcia's characterization of the evidence, the People's forensic expert testified that casings recovered at the scene came from the same type of weapon, a Glock semiautomatic, but were not necessarily fired from the same weapon. Ortiz saw Garcia pull a firearm from his pocket and run with Gomez and Andrade toward the apartment. Minutes later Ortiz heard a barrage of gunfire from at least two different guns. Serrano later identified Garcia and Gomez as the shooters. Here, in contrast to *Pearson,* there was ample evidence from which a rational jury could find Garcia personally used and intentionally discharged a weapon during the attack.

4. *Each of the Defendants' Convictions on Count 7 (Shooting a Firearm with Gross Negligence) Must Be Reversed Because That Offense Is a Lesser Included Offense of Shooting at an Inhabited Dwelling (Counts 3 and 4)*

Gomez, Alvarenga, Andrade and Garcia were each convicted on counts 3 and 4 (shooting at an inhabited dwelling) (§ 246) and count 7 (discharging a firearm with gross negligence) (§ 246.3). However, as Garcia and Alvarenga assert, section 246.3 is a lesser included offense of section 246. (See *People v. Ramirez* (2009) 45 Cal.4th 980, 990 ["[S]ection 246.3(a) is a necessarily included lesser offense of section 246. Both offenses require that the defendant willfully fire a gun. . . . All the elements of section 246.3(a) are necessarily included in the more stringent requirements of section 246."].)

20

Accordingly, the convictions on count 7 must be reversed. (See *People v. Sanders* (2012) 55 Cal.4th 731, 736 ["[w]hen a defendant is found guilty of both a greater and a necessarily lesser included offense arising out of the same act or course of conduct, and the evidence supports the verdict on the greater offense, that conviction is controlling, and the conviction of the lesser offense must be reversed"]; *People v. Milward* (2011) 52 Cal.4th 580, 589 [same].)[17]

5. *The Prosecutor's Comments During Closing Argument Do Not Compel Reversal*

"'The applicable federal and state standards regarding prosecutorial misconduct are well established. "'A prosecutor's . . . intemperate behavior violates the federal Constitution only when it comprises a pattern of conduct so "egregious that it infects the trial with such unfairness as to make the conviction a denial of due process."'"" [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ""'"the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury."'""" (*People v. Navarette* (2003) 30 Cal.4th 458, 506; accord, *People v. Morales* (2001) 25 Cal.4th 34, 44.) To determine whether misconduct has occurred, the reviewing court evaluates how the remarks would, or could, have been understood by a reasonable juror. (See, e.g., *People v. Cummings* (1993) 4 Cal.4th 1233, 1302 ["[i]f there is a reasonable likelihood that the jury would understand the prosecutor's statements as an

_____

17      Although the Attorney General insists the defendants' convictions for count 7 should not be reversed because they were not based "on the same act or course of conduct" as the greater offense, the record belies that characterization. The prosecutor's theory at trial was that the same act of shooting gave rise to multiple offenses, including counts 3, 4 and 7. In fact, the prosecutor told the jury, "And sometimes when a shooting like this happens, not only when you kill somebody have you committed a murder, when you almost kill somebody you have committed an attempted murder, when in the course of doing that the bullets fly into inhabited dwellings, when you've got shooting at an inhabited dwelling. And when you are shooting that erratically, then you've got shooting in a grossly negligent manner."

21

assertion that defense counsel sought to deceive the jury, misconduct would be established"].)

> a. *The trial court cured any incorrect statements on the standard of proof and the presumption of innocence by immediately admonishing the jury to follow its instructions*

Alvarenga contends the prosecutor misstated the law on the standard of proof when she said, "The instruction will tell you, it is not beyond a shadow of a doubt. It is not beyond any doubt. And it's not imaginary doubt. I will ask you, it's very easy sometimes when you . . . are listening to a gang case all of this time [to think] are we talking about a reasonable person standard or are we talking about a reasonable gangster standard? There is no reasonable gangster standard ladies and gentlemen. It is a reasonable person standard. What a reasonable person would see given the evidence." After Andrade's counsel objected that the comment misstated the law, the court admonished the jury, "Ladies and Gentlemen, the term of beyond a reasonable doubt is actually defined for you in the jury instructions. And the attorneys will give you their interpretation of what that means, of course. But it's up to you to decide the meaning of that based on the instruction that I gave you. For the record, it's instruction 220." The prosecutor persisted, "And nowhere in instruction 220 will you hear that it's a reasonable gangster standard. It's a reasonable person standard." Again, defense counsel objected that the prosecutor was articulating a civil standard of proof, not a criminal one. The court again instructed the jury, "Ladies and gentlemen, you are ordered to follow the law as I give it to you. Even if you hear something different from the attorneys, you follow the law that I give."

The prosecutor's juxtaposition of "a reasonable person standard" with a "reasonable gangster standard" in the context of describing reasonable doubt was likely misleading and, at the very least, confusing. Despite the Attorney General's characterization, the comments were hardly identical to reasonable doubt definitions that the United States Supreme Court has found appropriate (see *Victor v. Nebraska* (1994) 511 U.S. 1, 20 [114 S.Ct. 1239, 127 L.Ed.2d 583] [definition of reasonable doubt as "a

22

doubt that would cause a reasonable person to hesitate to act" is "a formulation we have repeatedly approved"]). Nonetheless, the trial court's prompt admonition to the jury to disregard counsel's interpretation of the law and follow the definition of reasonable doubt contained in CALCRIM No. 220 clarified any possible confusion and ensured the jury considered the correct standard. The court's immediate and diligent action dispelled any prejudice that may have otherwise resulted from the prosecutor's remarks.

Alvarenga also challenges the prosecutor's comments on the presumption of innocence. During closing argument the prosecutor told the jury each defendant was "[p]resumed innocent until proven guilty. Whenever that happens for you." Defense counsel objected the prosecutor had misstated the law. The court responded, "Ladies and gentlemen, you have the law. You follow the law as I give it to you, not as the attorneys give it to you. As I give it to you. You will get the instructions in writing." The prosecutor persisted, "It's proven—presumed innocent until proven guilty, whenever that proof happens for you. . . . And, whenever it happens for you, they are no longer presumed innocent." Again, defense counsel objected; and again the court intervened: "Ladies and gentlemen, I am going to say this one last time. You follow the law as I give it to you. The statements of counsel, that is not evidence. The evidence is what the witnesses testified to and the exhibits admitted into evidence. The law is the law that I give you, period. Even if the attorneys' comments conflict[] with the law, you must follow the law as I give it to you. That's in the instructions." The prosecutor continued, this time without objection, "Please read the law. It's assumed innocent until proven guilty. And these defendants, I submit to you, were proven guilty after the first witness took the stand."

Alvarenga contends the prosecutor improperly told the jury the presumption of innocence no longer applied at some point during the trial. Reviewing courts have recognized the substantial difference between a prosecutor's proper comment on the evidence and an improper statement of law concerning the presumption of innocence. (Compare *People v. Panah* (2005) 35 Cal.4th 395, 463 [prosecutor's argument that the evidence had "stripped away" defendant's presumption of innocence was a proper

23

comment on the evidence, not an incorrect statement of the innocence presumption] and *People v. Goldberg* (1984) 161 Cal.App.3d 170, 190 [prosecutor's comment "[t]here is *no more presumption of innocence*[;] [d]efendant Goldberg ha[d] been proven guilty by the evidence" was proper comment on the evidence] with *People v. Dowdell* (2014) 227 Cal.App.4th 1388, 1408 [prosecutor's remark that "[t]he *presumption of innocence is over*[,] [defendant] has gotten his fair trial" was an incorrect statement of the law and distinguishable from the comments made in *Panah* and *Goldberg* ].)  Here,  the prosecutor's comment, which suggested the jury need not consider the entire body of evidence in deciding whether the People had proved their case beyond a reasonable doubt and thereby defeated the presumption of innocence, crossed the line between permissible and impermissible closing argument.  However, the trial court's immediate admonition to the jury to consider the presumption of innocence as the court instructed was a correct statement of law and cured any possibility of prejudice from the prosecutor's statements.

> b. *Alvarenga has forfeited his contention the prosecutor disparaged defense counsel; his arguments are also without merit*

Alvarenga identifies three prosecutorial comments he contends improperly disparaged defense counsel.  First, after his counsel made his closing argument, the prosecutor responded in her summation, "Mr. Barish [(Alvarenga's counsel)], with a straight face, told you that when Clever said, yeah, all four of them were there to that unidentified man, oh, they were just talking about this fake alibi he was trying to set up.  Really, ladies and gentlemen?  I know Mr. Barish looks like a good, solid man with three-piece suits in front of you making jokes like foo [*sic*] and it's funny because a distinguished gentlemen like himself would come up here, but this isn't a funny case.  Really?  Listen to what Clever said.  He wasn't talking about no fake alibi.  It was a confession . . . ."

Second, again in her rebuttal to defense counsel's closing remarks the prosecutor stated, "Just like when Mr. Barish  tells you, when he is reading that transcript about when . . . his client, Kevin Alvarenga, is talking to his girlfriend Karely Gomez about a kite or a letter that he wrote to Sporty, Mr. Barish actually gets up with a straight face and

24

says to you, 'Ladies and gentlemen, oh wait until I read you this. I'm shaking in my boots.' And he read a lot to you about it. But what he left out was right here, ladies and gentlemen. . . ." The prosecutor then recited portions of the transcript.

Third, after Mr. Barish commented that Alvarenga had learned from his attorney, "whoever that might be," that Ernie Urquilla had talked to police, the prosecutor stated, Alvarenga learned "his name has come up. His attorney told him. And then, with a straight face, Mr. Barish said to you, 'whoever that might be.' Really? Whoever that attorney might be? He tells you his attorney is the one who gave the names of Ernie and Wally. Whoever that might be."

At the threshold, no objection was made to any of the comments Alvarenga now identifies. Accordingly, he has forfeited his prosecutorial misconduct arguments on appeal. (See *People v. Dykes* (2010) 46 Cal.4th 731, 766 [counsel must object to misconduct to permit trial court to address issue and to preserve claim for appeal; absent objection or demonstration that objection was futile, the claim is forfeited]; *People v. Prince* (2008) 40 Cal.4th 1179, 1275 [same].) They are also without merit.

A prosecutor commits misconduct when he or she attacks the integrity of or casts aspersions on defense counsel. (*People v. Hill* (1998) 17 Cal.4th 800, 832.) "'In addressing a claim of prosecutorial misconduct that is based on the denigration of opposing counsel, we view the prosecutor's comments in relation to the remarks of defense counsel, and inquire whether the former constitutes a fair response to the latter.'" (*People v. Pearson* (2013) 56 Cal.4th 393, 431-432.) Here, the prosecutor responded directly to Mr. Barish's arguments and told the jury the evidence contradicted the inferences Mr. Barish had offered. Although the prosecutor's occasional mocking references to Mr. Barish's humor and appearance—his three-piece suit—were gratuitous and perhaps ill-advised, there was no material misconduct and certainly no prejudice.

25

(See *People v. Osband* (1996) 13 Cal.4th 622, 695 [prosecutor's "remark was gratuitous, but his misconduct was also de minimus"].).)[18]

### 6. *Jury Instructions*

#### a. *CALCRIM No. 318, as given, was a correct statement of the law*

The court instructed the jury with CALCRIM No. 318, which provides, "You have heard evidence of statements that a witness made before the trial.  If you decide that the witness made those statements, you may use those statements in two ways:  [¶]  1.  To evaluate whether the witness's testimony in court is believable; [¶] AND [¶]  2.  As evidence that the information in those earlier statements is true."

Gomez, who did not object to the instruction at trial, contends this instruction affected his substantial rights by lessening the prosecution's burden of proof.  In effect, he argues, the instruction told the jury to give Serrano's out-of-court statements greater weight than his in-court testimony.  The instruction, however, did no such thing.  It told the jury it may, if it wished, consider Serrano's out-of-court statements for both the truth of the matter asserted and to assess his credibility.  That is an entirely correct statement of the law.  (Evid. Code, § 1235 [codifying prior inconsistent statement exception to hearsay rule and providing such statement may be considered for the truth of the matters asserted]; see *People v. Hudson* (2009) 175 Cal.App.4th 1025, 1028-1029 ["CALCRIM No. 318 informs the jury that it may reject in-court testimony if it determines inconsistent out-of-court statements to be true.  By stating that the jury 'may' use the out-of-court statements, the instruction does not require the jury to credit the earlier statements even while allowing it to do so.  [Citations.]  Thus, we reject defendant's argument that CALCRIM No. 318 lessens the prosecution's standard of proof by compelling the jury to accept the out-of-court statements as true."].)

Our conclusion is firmly reinforced by the Supreme Court's rejection of comparable challenges to the substantially similar language in CALJIC No. 2.13, the

---

[18]  In light of our holding that the comments did not amount to misconduct, Alvarenga's alternative argument that his counsel's failure to object to them constituted ineffective assistance also fails.

predecessor to CALCRIM No. 3.18. (See *People v. Friend* (2009) 47 Cal.4th 1, 41-42 [CALJIC No. 2.13[19] "in no way directs the jury to accept prior statements as the truth; it merely covers the hearsay exceptions provided in Evidence Code sections 1235 and 1236"]; accord, *People v. Harris* (2008) 43 Cal.4th 1269, 1293 [the instruction merely covers "in a neutral fashion" the hearsay exceptions provided in Evid. Code, §§ 1235 and 1236].) Accordingly, there was no error in instructing the jury with CALCRIM No. 318.

   b. *The trial court did not err in refusing requested pinpoint instruction*

Upon request a trial court must give jury instructions that pinpoint the theory of the defense, such as relating the reasonable doubt standard of proof to particular elements of the crime charged. (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1142-1143; *People v. Earp* (1999) 20 Cal.4th 826, 886.) However, the court may refuse to give a pinpoint instruction that is argumentative, duplicative or potentially confusing. (See *Earp,* at p. 886; *People v. Moon* (2005) 37 Cal.4th 1, 30.) In addition, a pinpoint instruction should not be given if it invites the jury to draw inferences favorable to one of the parties from specified items of evidence. (*Earp,* at p. 886; *People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1244; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 99.)

Andrade's counsel requested the court give a pinpoint instruction that "[r]umors may not be considered as evidence." Andrade's counsel reminded the court Roman and the Urquilla brothers had referred to "rumors on the street" when testifying and argued the instruction was necessary to prevent the jury from relying on those references as evidence. The prosecutor objected, characterizing the pinpoint instruction as an attempt by the defense to get their closing argument inserted as jury instructions. The court struggled with the proffered instruction, fearing that it would be confusing to jurors because the same witnesses who alluded to rumors on the street also testified that they

_____

[19]    CALJIC No. 2.13 provides, "Evidence that on some former occasion, a witness made a statement or statements that were inconsistent or consistent with his testimony in this trial may be considered by you not only for the purpose of testing the credibility of the witness, but also as evidence of the truth of the facts as stated by the witness on such former occasion."

27

had heard the information directly from Alvarenga and that evidence was admissible. Ultimately the court denied the request, telling defense counsel, "In terms of the pinpoint instructions, I think it's covered in a CALCRIM. The defense can certainly argue that Urquilla said he heard it from rumors and innuendo and that's not evidence. And the People can argue, hey he heard it straight from Alvarenga."

The requested instruction, as the court recognized, was largely duplicative. The court sustained objections to the mention of rumors when appropriate, and the jury was instructed not to consider questions to which the court had sustained objections. The jury was also instructed it could consider only evidence that is presented in the courtroom (CALCRIM No. 972), with the exception of out-of-court statements made by defendants (CALCRIM No. 985) or out-of-court statements made by testifying witnesses that are consistent or inconsistent with their trial testimony (CALCRIM NOS. 226, 318). Moreover, the defense vigorously asserted in its closing arguments, without objection, that rumor and innuendo were not evidence. The failure to give the requested pinpoint instruction was neither error nor prejudicial. (See *People v. Pearson, supra,* 53 Cal.4th at p. 325 [failure to give pinpoint instruction evaluated under *Watson* harmless error standard]; *People v. Hughes* (2002) 27 Cal.4th 287, 362-363 [same].)

7. *The Trial Court Did Not Err in Failing To Take Remedial Action after Gomez Shaved His Head During Trial*

On the last day of testimony in the People's case, Gomez appeared at trial with his head shaved, prominently displaying gang tattoos on his scalp. Andrade's counsel moved for a mistrial. Alternatively, Andrade requested a one-week continuance to allow Gomez's hair to grow out or an order requiring Gomez to wear a hat. The court rejected each of those requests, finding the displayed tattoos were cumulative of other evidence that had already been presented. Later, in response to the prosecutor's question, the People's gang expert testified Gomez's act of shaving his head during trial showed he was proud to be a Vincent Town gang member.

Andrade impliedly concedes that the evidence of Gomez's scalp tattoo was cumulative; substantially identical photographs of Gomez's scalp tattoo had been

28

admitted into evidence. However, he argues the court's failure to take remedial action denied him a fair trial because it effectively permitted the People's gang expert to opine that Gomez's voluntary display of gang tattoos during trial reflected Gomez's pride of membership and loyalty to the gang and suggested, by association, that his codefendants shared those characteristics.

Contrary to Andrade's contention, neither Gomez's gang tattoo nor the expert's testimony as to the implied meaning of Gomez's altered appearance during trial prejudiced Andrade. Such evidence was indisputably cumulative. In addition to the abundant evidence of both Gomez's and Andrade's membership in the Vincent Town gang, there was also evidence that Andrade had carved gang graffiti in his jail cell after his arrest. The People's expert testified that Andrade's own act of etching gang graffiti evidenced his own pride of membership and loyalty to the gang. Simply stated, Andrade has not shown the court's action, or in this case, inaction, in regard to Gomez's voluntarily altered appearance at trial deprived him of a fair trial.

8. *Sentencing Issues*

In light of our reversal of count 1, we vacate the sentences of Gomez, Alvarenga, Andrade and Garcia. Each defendant must be resentenced either after a retrial of count 1 or at the People's election upon reduction of the convictions in count 1 to second degree murder. To assist the trial court at resentencing, we address several of the defendants' sentencing contentions

a. *Section 654 and the two counts for shooting at an inhabited dwelling*

Section 654 prohibits separate punishment for multiple offenses arising from the same act or from a series of acts constituting an indivisible course of criminal conduct. (See *People v. Rodriguez* (2009) 47 Cal.4th 501, 507; *People v. Latimer* (1993) 5 Cal.4th 1203, 1206.) Section 654 does not apply to crimes of violence against multiple victims. (*People v. Correa* (2012) 54 Cal.4th 331, 341; see *People v. Oates* (2004) 32 Cal.4th 1048, 1063 ["[a] defendant who commits an act of violence with intent to harm more than one person or by means likely to cause harm to several persons is more culpable than a defendant who harms only one person"].)

29

Gomez contends his sentence on counts 3 and 4, shooting at an inhabited dwelling, should have been stayed under section 654 because the same act or series of acts were the basis for his convictions on count 1 (murder of Chairez) and count 2 (attempted murder of Serrano). Contrary to the trial court's finding, we agree the record is devoid of evidence that shooting at the inhabited dwelling involved a different intent and objective from the murder and attempted murder.[20] Nonetheless, as to count 4, the trial court properly declined to apply section 654.

The evidence was undisputed that apartment number 279 was occupied by Chairez's friend, Yesenia, and Yesenia's children at the time of the shooting. Thus, as to that count, the multiple victim exception to section 654 applied; and the court was permitted to sentence Gomez (and his confederates) on that count in addition to the murder and attempted murder counts. (See *People v. Felix* (2009) 172 Cal.App.4th 1618, 1631 ["Martin Gomez's houseguests were victimized by the shooting into the dwelling but were not named victims in any other count. It follows that the trial court properly declined to stay the sentence on count 2 (shooting at an inhabited dwelling) because it is governed by the multiple victim exception to section 654"]; *People v. Anderson* (1990) 221 Cal.App.3d 331, 338-339.)

Count 3, however, which involved the shooting of apartment number 131, is a different matter. The Attorney General has not identified any evidence that apartment number 131 was occupied at the time of the shooting nor has our own review of the record revealed any evidence there were victims in, at or near that apartment at that time. (Cf. *People v. Felix, supra,* 172 Cal.App.4th at p. 1631.)[21] As the Attorney General

---

[20]  The Attorney General does not argue the trial court's finding is supported by substantial evidence. Instead she confines her argument to the multiple victim exception to section 654, noting we may affirm the sentence regardless of reasons given by the court.

[21]  Detective Parshall's very brief testimony that apartment number 131 was "an inhabited dwelling" was insufficient, by itself, to support the multiple victim exception to section 654; he did not testify there were victims present at the time of the shooting. (See

impliedly concedes, the shooting of an inhabited dwelling in count 3 was part of the same act or series of acts constituting an indivisible course of conduct. Absent evidence of other victims in or near the apartment at the time of the shooting, the multiple victim exception is inapplicable; and the sentences on count 3 were subject to the proscription against multiple punishment contained in section 654.

### b. *The sentence imposed on count 4 was unauthorized*

As to all defendants, the trial court imposed two consecutive 35-year-to-life terms for counts 3 and count 4, calculated by adding the 25-year-to-life firearm enhancement under section 12022.53, subdivision (d), and the 10 year gang enhancement for violent felons pursuant to section 186.22, subdivision (b)(1)(C), with no explanation for the absence of any base term for the underlying offense (§ 246) itself.[22] As discussed in the preceding section, execution of any sentence imposed on count 3 must be stayed under section 654. The sentence on count 4 may be imposed, but it was incorrectly determined by the trial court: Section 186, subdivision (b)(4)(B), specially alleged in the information, provides an alternative sentence for a section 246 offense committed for the benefit of a criminal street gang—an indeterminate life term with a minimum parole eligibility period of 15 years. Coupled with the firearm-use findings under section 12022.53, subdivision (d), therefore, the defendants' aggregate sentences on count 4 should have been 40 years to life, not 35 years to life. (See § 12022.53, subd. (e)(2) [enhancement for participation in criminal street gang shall not be imposed *unless* the person "personally used or personally discharged a firearm in the commission of the offense"]; *People v. Brookfield* (2009) 47 Cal.4th 583, 591-592].)

---

§ 246 ["[a]s used in this section, 'inhabited' means currently being used for dwelling purposes, whether occupied or not."].)

[22] The clerk's minute order and the abstract of judgment identify the 25-year-to-life sentence as the base term for the offense of shooting at an inhabited dwelling. That is neither what the court said at the sentencing hearing nor, in any event, an authorized sentence for a violation of section 246 committed for the benefit of a criminal street gang.

c. *The court properly sentenced Garcia for count 6*

Garcia also contends his sentence for possession of a firearm by a felon should have been stayed under section 654. However, section 654 does not bar separate punishments for the offense of unlawfully possessing a firearm and a crime committed with the firearm when those crimes were separate acts and did not involve an indivisible course of conduct. Unless the evidence demonstrates "'at most that fortuitous circumstances put the firearm in the defendant's hand only at the instant of committing another offense,'" punishment for both offenses is proper. (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1144 [section 654 did not bar punishment for both possession of firearm by felon and shooting at inhabited dwelling]; cf. *People v. Bradford* (1976) 17 Cal.3d 8, 22-23 [where defendant wrestled away officer's revolver and shot officer with it, punishment for both assault with deadly weapon on peace officer and possession of firearm by felon was prohibited by section 654].)

Here, there is substantial evidence that Garcia arrived at the scene of the crime already armed with a firearm. Under those circumstances section 654 does not prohibit punishment for both the unlawful possession and the subsequent firearm-related crime. (*People v. Jones, supra,* 103 Cal.App.4th at p. 1144; see *People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1378 [evidence that defendant arrived at scene of kidnapping and carjacking already in possession of firearm was sufficient to show that defendant harbored separate intent and objective in illegally possessing firearm and in using firearm in commission of kidnapping during carjacking].)

d. *Gang crime* (*Count 8*)

Finally, the court imposed a concurrent three-year prison term on count 8, street terrorism (§ 186.22, subd. (a)), also referred to as "a gang crime."[23] Garcia and

_____

23 Section 186.22, subdivision (a), "applies to '[a]ny person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang.' As the statutory text indicates, the gang crime has three elements: (1) '[a]ctive participation in a criminal street gang, in the sense of participation that is more than nominal or passive,' (2) '"knowledge that [the

32

Alvarenga contend, and the Attorney General concedes, section 654 prohibits multiple punishment for both the gang crime, which requires a finding of assisting gang members in committing the underlying felony, and aiding and abetting the same underlying offense. (See *People v. Mesa* (2012) 54 Cal.4th 191, 200; *People v. Sanchez* (2009) 179 Cal.App.4th 1297, 1301, disapproved on another ground in *People v. Rodriguez* (2012) 55 Cal.4th 1125, 1137, fn. 8.) Accordingly, on remand for resentencing, count 8 should be stayed pursuant to section 654.

### e. *Alvarenga's challenge to his indeterminate life sentence is moot*

Alvarenga contends his aggregate indeterminate sentence of 160 years to life was disproportionate to the crimes committed and, because he was only 17 years old at the time of the offense, violates the Eighth Amendment prohibition on cruel and unusual punishment and the proscription in article I, section 17 of the California Constitution of cruel or unusual punishment as announced in *Miller, supra,* 132 S.Ct. 2455, *People v. Gutierrez* (2014) 58 Cal.4th 1354 and *People v. Caballero* (2012) 55 Cal.4th 262. In response, the Attorney General asserts the sentence is not disproportionate and the sentence imposed is not the functional equivalent of life without the possibility of parole because, pursuant to section 3051, subdivision (b)(3), Alvarenga will receive a parole suitability hearing during his 25th year of incarceration.

The constitutionality of Alvarenga's 160 years-to-life sentence is moot in light of our reversal of his first degree murder conviction and remand either for retrial on that count or for resentencing in accordance with a prosecutorial election to reduce the conviction to second degree murder. Although a similar issue could very well arise when Alvarenga is resentenced, the Supreme Court may resolve the fundamental question presented by Alvarenga in the near future: In *In re Alatriste* (S214652, rev. granted Feb. 19, 2014) and *In re Bonilla* (S214960, rev. granted Feb. 19, 2014), the Supreme

---

gang's] members engage in or have engaged in a pattern of criminal gang activity,"' and (3) 'the person "willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang."'" (*People v. Mesa* (2012) 54 Cal.4th 191, 197.)

Court will consider whether the opportunity for a parole suitability hearing after a maximum of 25 years for most juvenile offenders serving life sentences moots any claim that such a sentence violates the Eighth Amendment. Both cases are fully briefed and awaiting oral argument. The answer to that question, therefore, will likely be available to the trial court before any further sentencing hearing takes place. To the extent appropriate, at that time the court, clearly aware of the factors identified in *Miller* for sentencing juveniles,[24] should hold a thorough hearing considering Alvarenga's status as a juvenile offender in accordance with *Miller, Guttierez* and *Caballero.*

## DISPOSITION

The convictions of Gomez, Andrade, Alvarenga and Garcia on count 1 and on count 7 are reversed; the defendants' sentences are vacated in their entirety and the matter is remanded in accordance with *Chiu, supra,* 59 Cal.4th 155, for the People to either accept a reduction of the convictions on count 1 to second degree murder or to retry the defendants (or any of them) for the greater offense under a legally valid direct perpetrator or direct aiding and abetting theory. At resentencing on all counts, the court will have the opportunity to address the sentencing errors identified in this opinion and conduct further proceedings not inconsistent with this opinion. Gomez's, Alvarenga's, Andrade's and Garcia's convictions on counts 2 through 6 and count 8 are affirmed.


PERLUSS, P. J.


We concur:

ZELON, J.          STROBEL, J.[*]

---

[24]    At Alvarenga's sentencing hearing, the trial court indicated it was well aware of the cases addressing sentencing juvenile offenders to terms that are the functional equivalent of life without parole: "The court has considered several cases that deal with sentencing juvenile offenders to terms that are the functional equivalent of life, including life without parole, including . . . *Miller v. Alabama* [132 S.Ct. 2455] and *People v. Caballero* [55 Cal.4th 262], which I am intimately familiar with because I was the trial judge in *Caballero.*"

[*]    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.